UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
**CASE NO:** 06-60823 CIV-DIMITROULEAS/Rosenbaum

MAILPLANET.COM, INC., a Corporation of
the District of Columbia

  Plaintiff,

v.

LO MONACO HOGAR, S.L., a Limited
Liability Company of Spain

  Defendant.

_____/

## **PLAINTIFF, MAILPLANET.COM'S, MOTION FOR SUMMARY JUDGMENT**

  Plaintiff, MailPlanet.com, Inc.(herein "MailPlanet") hereby moves for entry of summary judgment under Fed. R. Civ. P. 56 and requests entry of judgment in its favor, because Defendant, Lo Monaco Hogar, S.L. (herein "HOGAR") has not and cannot establish any trademark rights in the U.S.; is barred under Fed. R. Civ. P. 36(c)(1) from introducing evidence to establish such rights; and MailPlanet has not committed acts of unfair competition in the U.S. relative to Hogar.

  This Court has subject matter jurisdiction and personal jurisdiction over HOGAR.  See Answer paragraphs 1, 2, 5, 13 (herein "Ans. ¶¶ 1, 2, 5, 13"). The Plaintiff filed this suit pursuant to the Anticybersquatting Consumer Protection Act (the "ACPA") 15 U.S.C. §1114(2)(d)(v), which states "A domain name registrant [MailPlanet] whose domain name [lomonaco.com] has been suspended, disabled, or transferred under a policy described under clause (ii)(II) [WIPO decision D2005-0896, PL Exh A] may, upon notice to the mark owner [allegedly HOGAR], file a civil action

1

to establish that the registration or use of the domain name [lomonaco.com] by such registrant [MailPlanet] is not unlawful under this Act."

While 15 U.S.C. §1114(2)(d)(v) permits a civil action by the domain registrant, the Court may not consider the substance of the prior WIPO decision. "The ACPA provides an allegedly aggrieved trademark owner a cause of action similar to, yet distinct from, the threshold for an administrative remedy under UDRP Paragraphs 4(a)-(c). We agree with the First and Fourth Circuits that claim brought by a domain name registrant under § 1114(2)(D)(v) seeks 'a declaration of nonviolation of the ACPA,' not requiring (or permitting) review of the UDRP panel's application of the UDRP's cybersquatting standard, but instead 'trump[ing] the panel's finding of noncompliance.'" Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 382 (2d Cir. 2003)(quoting Sallen v. Corinthians LTDA, 273 F.3d 14, 18 and 27 (1st Cir. 2001)); accord Hawes v. Network Solutions, Inc., 337 F.3d 377, 386 (4th Cir. 2003) ("An action brought under § 1114(2)(D)(v) on the heels of an administrative proceeding [under the UDRP]. . . is independent of, and involves neither appellate-like review of nor deference to, the underlying proceeding.").

As the First Circuit explained:

> [T]he UDRP clearly contemplates judicial intervention and, in fact, that the judicial outcome will override the UDRP one. See UDRP P 4(k) (stating that UDRP proceedings shall not prevent either party from "submitting the dispute to a court of competent jurisdiction for independent resolution"); World Intellectual Property organization, The Management of Internet Names and Addresses: Intellectual Property Issues: Final Report of the WIPO Internet Domain Name Process P 150(v), at http://wipo2.wipo.int/process1/report/finalreport.html (Apr. 30, 1999) [hereinafter First WIPO Report] (stating that UDRP administrative dispute resolution procedures "should not have (and cannot have) the effect of binding precedent in national courts"); id. at P 196(v) (stating that "[a] decision by a court of competent jurisdiction, that is contrary to a determination resulting from the administrative procedure should . . . override the administrative determination").

Sallen v. Corinthians Licenciamentos LTDA, 273 F.3d 14, 26 (1st Cir. 2001); accord BroadBridge Media, L.L.C. v. Hypercd.com, 106 F. Supp. 2d 505, 508-09 (S.D.N.Y. 2000);  Weber-Stephen Prods. Co. v. Armitage Hardware & Bldg. Supply, Inc., 2000 U.S. Dist. LEXIS 6335 (N.D. Ill. May 3, 2000) (concluding that "the ICANN Policy and its accompanying rules do contemplate the possibility of parallel proceedings in federal court" and that federal courts are "not bound by the outcome of the ICANN administrative proceedings"); Parisi v. Netlearning, Inc., 139 F. Supp. 2d 745, 751-52 (D. Va. 2001)(concluding that UDRP proceedings should not receive the significant deference accorded to arbitration under the Federal Arbitration Act).

Uncontested Facts

Plaintiff MailPlanet purchased the accused domain (www.lomonaco.com) from a registrar and the domain ownership  was subject to the Uniform Domain Resolution Procedures ("UDRP"). (See http://www.icann.org/dndr/udrp/policy.htm)(Admitted in Ans. ¶¶ 3, 7, 9).  HOGAR filed a complaint under the UDRP (Ans. ¶¶ 10) and an international panel of arbitrators, selected by WIPO in Geneva, Switzerland, decided under international law that the accused domain, lomonaco.com, should be transferred to HOGAR. (Admitted in Ans. ¶¶ 9, 10, 11; see also the attached WIPO decision, PL Exh A).  HOGAR admitted that the UDRP decision "...shall not prevent either you [plaintiff, domain owner MailPlanet] or the complainant [ defendant, HOGAR] from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding is concluded." Ans. ¶¶  11, Complaint ¶¶  11.

HOGAR admitted that it manufactures and sells mattresses in Spain (Ans. ¶¶ 19) and admitted that HOGAR "does not sell mattresses in the United States under the Lo Monaco trademark," Ans. ¶¶ 20, all in response to MailPlanet's allegation that "LO MONACO HOGAR does not engage in interstate commerce in the United States of America in connection with the manufacture, sale, or transportation of mattresses or any other article denominated as originating with LO MONACO HOGAR." Compl. ¶¶ 20. Further, "Defendant [HOGAR] admits that it has a number of trademark registrations in both Spain and Portugal" but then states, without specifying the grounds therefore, "that it has rights under the Lanham Act [the Federal Trademark Act, 15 U.S.C. §1051]." Ans. ¶¶ 21. HOGAR admits that it has not registered "lomonaco" in the United States Patent and Trademark Office. Ans. ¶¶ 22. Nowhere in the pleadings does HOGAR specify which rights it has under the federal trademark act, the Lanham Act, 15 U.S.C. sec. 1051. HOGAR has failed to come forward with any evidence that it sells any products or services in the U.S. Fed. R. Civ. P. 26(a)(requiring a party to disclose evidence in support of its pleading).

The WIPO panel, relying upon the arguments and evidence submitted to them, made the following relevant findings: "The Panel finds that the Grupo Lo Monaco trademarks **are well recognized throughout Spain** in association with mattresses and associated goods and services sold in Spain by Complainant." (WIPO decision, D2005-0896, PL Exh A, pg 14)(emphasis added). HOGAR's Rule 26(a) disclosures were limited to the following response: "In accordance with Fed. R. Civ. P. 26(a)(1), LoMonaco intends to rely upon any documents, exhibits or witnesses referenced in the UDRP proceedings between the parties (Case No. D2005-0896)." Attached PL Exh B (shows Rule 26(a)(1) demands and HOGAR's response).

MailPlanet, has provided significant discovery responses and identified its witnesses in its initial disclosures.  As set forth in Nathaniel Cohen's Declaration, President of MailPlanet, MailPlanet had legitimate reasons for registering, using and advertising the disputed domain. When MailPlanet initially purchased the accused domain, its business plan sought to commercially exploit the accused and other "last name" domains as vanity email addresses.  MailPlanet's primary business was to (i) purchase domains identical to common family or surnames and (ii) license the use of specific email addresses, with the "surname domains," to users, particularly users having a surname "lomonaco."  Cohen Decl. ¶¶ 5, see also attached exhibits "Cohen Exh pg. 000001-000051."  Many persons in the U.S. have the last or family name of "lomonaco" (see white pages listings, Cohen Exh. pg 000019-000032, 000062-000068)  and some of those persons may want to license the use of a personalized vanity email. For example "michael@garcia.com."   MailPlanet licensed others in its vanity email-surname business (Cohen Decl. ¶¶ 8, see also Cohen Exh pg.000033-000051), but never licensed a "lomonaco" email surname.  Cohen decl. ¶¶ 8.

Due to mounting costs and insufficient licensing income, MailPlanet shifted its business plan, stopped accepting new accounts, and placed the accused domain, lomonaco.com, along with other surname domains that had not attracted customer sign-ups, with a "parking service."  The parking service ("DOMAIN SPONSOR") listed links of generic names of products and services on the accused domain.  When an Internet user located the accused domain, he or she was shown a list of generic names of products and services and, if the Internet user selected and was transferred to a particular product/service, MailPlanet was paid a portion of the advertising fee.  Typically, these ad campaigns are called "pay per click" systems and the advertisers pay a small fee (a few cents) when an Internet user clicks on the ad.  After the user "clicks-on" the displayed generic ad on the

accused domain, the user is transferred to the advertiser's site (or an affiliated reseller of the advertiser's goods/services). Cohen Decl. ¶¶ 9, see also Cohen Exh pg 000052-000061.

### Standard of law

"Summary judgment is appropriate when there are no issues of material fact and the moving party is entitled to judgment as a matter of law." Golan v. Pingel Enterprise, Inc., et al., 310 F.3d 1360, 1367 (Fed. Cir. 2002) (citing Fed. R. Civ. P. 56 and Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 247-48 (1986)). Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Rink v. Cheminova, Inc., 400 F. 3d 1286, 1294 (11th Cir. 2005).

When a moving party has discharged its burden, the non-moving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 252 (1986); see also Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the party opposing the motion. Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369(11th Cir. 1998) (citations and quotations omitted). The Court must "avoid weighing conflicting evidence or making credibility determinations." Hilburn v. Murata Electronics N. Am, Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). Rather, the determination is whether there are any genuine issues of fact which should properly be resolved by the fact finder because they can be resolved in favor of either party. Anderson, 477 U.S. at 250. Further, the Court should not entertain any discussion or arguments regarding the intent of the parties' actions. "Questions of motive and intent are particularly inappropriate for summary judgment." Bivins v. Wrap It Up, 2007 U.S. Dist. LEXIS 74958 (S.D. Fla. 2007)(citing Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962)).

**A. HOGAR Cannot Establish Trademark Rights In The U.S.**

In its pleadings, HOGAR suggests it has some unspecified rights under the Federal Trademark Act, the Lanham Act, 15 U.S.C. sec. 1051 -1141. Although the Lanham Act does not supplant a party's common law and equitable trademark rights, the courts look primarily to the Lanham Act to define the parties' trademark rights. See Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 323 (U.S. 1938); Estate of P. D. Beckwith, Inc. v. Commissioner of Patents, 252 U.S. 538, 543 (U.S. 1920); Park 'n Fly v. Dollar Park & Fly, 469 U.S. 189 (U.S. 1985). HOGAR, in its pleadings, stated that it has rights under the Lanham Act, therefore this Court should focus on what rights it has under the Lanham Act. (Ans. ¶ 21). HOGAR did not identify any other rights or causes of action in its proceedings or motions and is foreclosed from further defensive pleading.

The Lanham Act requires "use" in U.S. commerce of a mark as a prerequisite. Beginning with the intent of the legislation, the "use in commerce" idea is prominently emphasized.

> The term "**use in commerce**" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this Act, a mark shall be deemed to be in use in commerce (1) on goods when (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce, and (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127(emphasis added)

Building upon that concept, the Act establishes liability for improper use of a registered trademark by dictating:

> Any person who shall, without the consent of the registrant (a) **use in commerce** any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) produce, counterfeit, copy, or colorably imitate a registered mark... [which] is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114 (1)(emphasis added)

This "use in commerce" requirement also applies to infringers of unregistered trademarks:

> Any person who, on or in connection with any goods or services, or any container for goods, **uses in commerce** any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

8

15 U.S.C. § 1125(a)(1)(emphasis added)

The "use in commerce" requirement applies in trademark dilution (blurring or tarnishment) actions:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, **commences use of a mark or trade name in commerce** that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark... (2) Definitions. (A) For purposes of paragraph (1), a mark is **famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services** of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider ... [t]he duration, extent, and geographic reach of ...[t]he amount, volume, and geographic extent of sales of goods or services ....

15 U.S.C. § 1125(c)(emphasis added)

Despite being faced with this strong "use in commerce" statutory requirement, HOGAR has not presented any evidence that it sells any goods in the U.S., and admits that it sells no mattresses in this country. There is no evidence that HOGAR uses the Lo Monaco mark in the U.S. Nowhere in the pleading does HOGAR specify the scope or content of its rights under the Lanham Act, 15 U.S.C. §1051 -1141.

MailPlanet has not violated the ACPA, the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), which is a part of the Lanham Act.

> A person shall be liable in a civil action **by the owner of a mark**, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--(I) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that-- (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or (III) is a trademark, word, or name protected by reason of section 706 of title 18, United States Code, or section 220506 of title 36, United States Code.

15 U.S.C. § 1125(d)(1)(A)(emphasis added)

As explained later in more detail, HOGAR has no rights in the U.S. and therefore cannot be considered an "owner of a mark" under the ACPA §(d)(1)(A) above.  Further, HOGAR's mark is neither distinctive nor famous as contemplated in  §(d)(1)(A)(ii) above.  The ACPA permits MailPlanet to challenge the WIPO decision which applied international law. MailPlanet has superior rights to the accused domain under the ACPA, 15 U.S.C. §1114(2)(d)(v), because HOGAR never used the accused domain in the U.S.

**B.     By Failing To Timely Provide Rule 26(a)(1) Disclosures, HOGAR Is Barred From Establishing Rights in the U.S.**

HOGAR has failed to come forward with any evidence that it sells any products or services in the U.S., as required by the document and witness disclosure requirements of Rule 26 of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 26(a).  If HOGAR now brings forth evidence of "use in commerce," it is barred from using such new evidence because it failed to timely disclose the same to MailPlanet. Therefore, the Court must conclude that HOGAR does not sell any product or service in the U.S. and has no rights under the Lanham Act.  The adverse WIPO decision, subject to reconsideration by MailPlanet's ACPA action herein, also reveals that HOGAR did not present any evidence establishing U.S. rights. The only arguments presented by HOGAR to the WIPO panel were related to its rights and usage in Spain, outside the U.S. Specifically, as reported in the WIPO decision, HOGAR argued:

> Complainant [HOGAR] submits that it is one of the leading companies **in Spain** in selling household items and services associated therewith. Complainant's best known product is a high quality mattress made of latex. At present, Complainant has more than **300,000 clients all over Spain having commenced business in Spain** in 1996. Complainant's **sales in Spain** were as follows: 2001, over 27 million Euro and 2002, over 54 million Euro, 2003, over 64 million Euro and 2004, over 82 million Euro. Exhibit 3 to the Complaint. Complainant is active in financially supporting nonprofit public organizations such as the Red Cross, United Family Foundation, Cancer

> Association. Complainant also financially supports organizations providing **cultural activities in Spain**. Lists of their public service activities are attached as Exhibit 4 to the Complaint. Complainant states that its goods and services are widely advertised in print and on television in association with its registered trademark as well as the trademark LO MONACO & design, which is **well known in Spain**. Invoices for television advertising form part of Exhibit 6 to the Complaint. Complainant states that, as a result of its public service contributions and support, extensive advertising of its **goods and services in Spain**, and substantial sales of **goods and services in Spain**, the Complainant's trademarks for or including LO MONACO are very **well known throughout Spain**. As part of Exhibit 6 the Complainant includes copies of printouts of ranking of well known **trademarks in Spain** showing high recognition of LO MONACO as a **trademark for goods and services in Spain**.

Lo Monaco Hogar, S.L. v. MailPlanet.com, Inc., WIPO, D2005-0896, PL Exh A, pg. 3 (emphasis added).

The WIPO panel, relying upon the arguments and evidence submitted to them, made the following relevant findings: "The Panel finds that the Grupo Lo Monaco trademarks **are well recognized throughout Spain** in association with mattresses and associated goods and services sold in Spain by Complainant." (WIPO decision, D2005-0896, PL Exh A pg 14)(emphasis added).

HOGAR's Rule 26(a) disclosures were limited to the following response "In accordance with Fed. R. Civ. P. 26(a)(1), LoMonaco intends to rely upon any documents, exhibits or witnesses referenced in the UDRP proceedings between the parties (Case No. D2005-0896)." PL Exh B (Rule 26(a)(1) demands and HOGAR's response). Since there were **no findings of U.S. rights** by the WIPO panel and HOGAR did not list evidence or exhibits in the proceeding establishing any U.S. rights, this Court has no evidence of such rights. More importantly, HOGAR is barred from presenting any additional or new evidence to this Court beyond the WIPO evidence cited in its initial disclosures.

The enforcement provisions of Rule 26(a) are explained in Fed. R. Civ. P. 36(c)(1), "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1),

11

or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 36(c)(1). HOGAR is limited to its WIPO evidence, showing no U.S. trademark rights.

MailPlanet, on the other hand, has provided significant discovery responses and identified its witnesses in the initial disclosures. Contained within those documents, MailPlanet establishes its legitimate reasons for registering, using and advertising the disputed domain. When lomonaco.com was initially purchased MailPlanet sought to commercially exploit the accused domain as a vanity email address by licensing others the use of email surname addresses. Cohen Decl. ¶¶ 4, see also Cohen Exh pg. 000001-000051. Although not successful with the accused domain, MailPlanet did license many other domains such as garcia.com, rosner.com, and bellamy.com. Many persons in the U.S. have the surname or family name of "lomonaco" (see white pages listings Cohen Exh. pg 000033-000051).

Due to mounting costs and insufficient licensing income, MailPlanet shifted its business plan, stopped accepting new accounts, and placed the accused domain, lomonaco.com, along with other surname domains that had not attracted customer sign-ups, with a "parking service." When a user landed the accused domain, the parking service ("DOMAIN SPONSOR") listed links of generic names of products and services. Once selected the user was transferred to a particular product/service web site and MailPlanet was paid a portion of the advertising fee. Typically, these "pay per click" ad systems require an advertiser to pay a small fee (a few cents) when the user clicks-on the ad. Cohen Decl. ¶¶ 11, see also Cohen Exh pg 000052-000056.

None of these Internet activities, that is, licensing vanity email addresses (such as jose@lomonaco.com) or using www.lomonaco.com as a parking service with generic, non-specific, nor targeted "pay-per-click" advertising revenue, is illegal or unlawful in the absence of U.S. lomonaco rights by HOGAR.

**C.     MailPlanet Did Not Engage In Unfair Competition**

A recent Second Circuit case addressed the issue of whether a company could assert its foreign rights in the U.S., sufficient to establish trademark infringement. In ITC Ltd. v. Punchgini, Inc. 482 F.3d 135 (2nd Cir. 2007), the court found that "...ITC abandoned its United States rights in its registered 'Bukhara' mark for restaurant services and, therefore, cannot assert a successful claim for trademark infringement under section 32(1)(a) of the Lanham Act or state common law...[and] plaintiff cannot assert a successful federal claim for unfair competition because Congress has not incorporated the substantive protections of the famous marks doctrine set forth in Paris Convention Article 6bis and TRIPs Article 16(2) into the relevant federal law, and this court cannot recognize the doctrine simply as a matter of sound policy...." Id. at 171.

In the ITC case, the plaintiff, foreign trademark owner, tried to invoke the famous marks/territoriality principle, which the court carefully rebuffed. The court detailed the requirements of bringing a Section 43(a) action and the statutory shortcomings which barred plaintiff's actions. "Section 43(a)(1)(A) [of the Lanham Act] allows the producer of a product or service to initiate a cause of action against a person who uses 'any word, term name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of [the producer's] . . . services.' 15 U.S.C. § 1125(a)(1)(A). This protection is broader than that afforded by section 32(1)(a), which prohibits only infringement of marks actually registered

with the Patent and Trademark Office." Id. at 153-54 (citations omitted). The court further explained: "To succeed on a section 43(a)(1)(A) claim, a plaintiff must prove (1) that the mark or dress is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant. Preliminary to making this showing, however, a plaintiff **must demonstrate its own right to use the mark or dress in question**." Id. at 154(citations omitted)(emphasis added).

With that statutory framework, the court then rebuffed plaintiff's foreign priority arguments. "Precisely because a trademark has a separate legal existence under each country's laws, ownership of a mark in one country does not automatically confer upon the owner the exclusive right to use that mark in another country. Rather, a mark owner must take the proper steps to ensure that its rights to that mark are recognized in any country in which it seeks to assert them. Cf. Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona, 330 F.3d 617, 628 (4th Cir. 2003) (United States courts do not entertain actions seeking to enforce trademark rights that exist only under foreign law.); E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1531 (11th Cir. 1985) (Our concern must be the business and goodwill attached to United States trademarks, not French trademark rights under French law. (internal quotation marks omitted))." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 155 (2nd Cir. 2007).   The court even made a very specific and pointed comment about the existence of the "famous marks doctrine" in the federal statute, noting "....the federal basis for the Trademark Board's recognition of the famous marks doctrine is never expressly stated." Id. at 159. The court went further to fully describe their understanding of foreign rights in the U.S., explaining "...we do not ourselves discern in the plain language of sections 44(b) and (h) a clear congressional intent to incorporate a famous marks exception into federal unfair competition

law. Section 44(b) guarantees foreign mark holders only 'the benefits of this section . . . to the extent necessary to give effect to any . . . convention, treaty or reciprocal law,' as well as the 'rights to which any owner of a mark is otherwise entitled by this chapter.' 15 U.S.C. § 1126(b). In short, whatever protections Article 6bis and Article 16(2) might contemplate for famous marks, section 44(b) grants foreign mark holders covered by these treaties only those protections of United States law already specified in the Lanham Act." Id. at 164.

The Second Circuit was deliberate in pointing out the flaw in plaintiff's central argument regarding use in commerce. "Thus, absent **some use of its mark in the United States**, a foreign mark holder generally may not assert priority rights under federal law, even if a United States competitor has knowingly appropriated that mark for his own use." Id. at 156 (emphasis added)(citing Person's Co. v. Christman, 900 F.2d 1565, 1569-70 (Fed. Cir. 1990)(holding that foreign use is not sufficient to establish priority rights even over a United States competitor who took the mark in bad faith)).

WHEREFORE, Plaintiff, MailPlanet.com, Inc. hereby moves for entry of summary judgment under Fed. R. Civ. P. 56 and requests entry of judgment in its favor, because Defendant, Lo Monaco Hogar, S.L. cannot establish any trademark rights in the U.S.; is barred under Fed. R. Civ. P. 36(c)(1) from introducing evidence to establish such rights; and MailPlanet has not committed acts of unfair competition in the U.S. relative to HOGAR.


Dated:  Oct. 17, 2007                              Respectfully submitted,

Fort Lauderdale, Florida

                                                    By: s/ Robert Kain

        Robert C. Kain, Jr. (266760)
        Darren J. Spielman FL Bar #0010868
        RKain@FocusOnIP.com
        Fleit, Kain, Gibbons, Gutman, Bongini & Bianco, P.L.
        750 Southeast 3rd Avenue, Suite 100
        Fort Lauderdale, Florida 33316
        Telephone:   (954) 768-9002
        Facsimile:    (954) 768-0158
        Attorneys for Plaintiff Mailplanet.com, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true accurate and correct copy of the foregoing was served via U.S. Mail on __Oct. 17_____, 2007 on all counsel or parties of record on the attached service list.

        _s/ Robert Kain_____

        Robert C. Kain, Jr.

**SERVICE LIST**

CASE NO.: 06-60623-CIV- DIMITROULEAS/SELTZER

Michael J. Colitz, III
Holland & Knight LLP
100 N. Tampa Street
Suite 4100
Tampa, FL 33601-3644
Tel: 813-227-8500
Fax: 813-229-0134
Email: michaelcolitz@hklaw.com
Attorney for LoMonaco Hogar, S.L.

F:\RCK\CLIENTS\MailPlanet\SJ-101707-final.wpd